IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHENZHEN GAIYATUOPU NETWORK TECHNOLOGY CO., LTD., <br><br>Plaintiff, <br><br>v. <br><br>THE INDIVIDUALS, CORPORATIONS, LIMITED LIABILITY COMPANIES, PARTNERSHIPS, and UNINCORPORATED ASSOCIATES IDENTIFIED ON SCHEDULE "A," <br><br>Defendants. | Case No. 1:24-cv-05111 <br><br>Judge Jeffrey I. Cummings <br><br>Magistrate Judge Beth W. Jantz <br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S OPPOSITION TO EMERGENCY MOTION TO VACATE TRO**

On Sunday December 1, 2024, Defendant Nos. 13 and 65[1] "Shenzhen Aixiong Technology Co., Ltd. d/b/a SWEETFULL®" ("Moving Defendant") filed an Emergency Motion to Dissolve the *Ex Parte* Temporary Restraining Order [31]. On December 5, 2024, Moving Defendant filed an uninvited Reply [36] raising additional arguments not included in the original Motion. For the sake of completeness, and without acquiescing to the propriety of the Reply, Plaintiff responds to all arguments raised by Moving Defendants in both filings.

**I.  Efforts to Reach Compromise**

After Moving Defendant's initial filing, the Court Ordered the Parties to "meet and confer regarding the relief sought in defendant's motion." [32] On December 5, 2024, the Court further

---

[1] During the conference on December 6, 2024, Moving Defendant confirmed that an Amazon.com and Temu.com store were at issue. Based on that representation, Plaintiff understands Moving Defendant operates Defendant Store Nos. 13 (Amazon Seller ID A4BBO00J6TH94) and 65 (Temu Seller ID 634418210084037) as identified on Schedule A to the Complaint.

1

Ordered the Parties to hold a telephonic conference to discuss the motion and file a joint status report on December 6, 2024. [38]. Upon receiving each Order, Plaintiff reached out to Moving Defendant, provided available times for a telephonic conference, and outlined initial thoughts on how the Parties could reach a compromise regarding some or all of the issues raised in Moving Defendant's Motion. The Parties were ultimately able to confer via telephone on the morning of December 6, 2024. Unfortunately, that discussion was limited by Moving Defendant to the topics of a briefing schedule on the pending Motion or a full settlement of the case. Moving Defendant did not wish to discuss any attempt to resolve the pending Motion short of resolving the entire case. However, the Parties were able to agree on a proposed briefing schedule which has now been entered by the Court [46].

## II.     Legal Standard

The Parties seemingly agree that the standard governing entering or dissolving a temporary restraining order is the same as entering or dissolving a preliminary injunction. Plaintiff disputes, however, that Seventh Circuit case law applied. Rather, the proper standard for resolving injunctive relief under the Patent Act is governed by Federal Circuit caselaw. *See e.g.*, *Revision Military, v. Balboa Mfg. Co.*, 700 F.3d 524, 525 (Fed. Cir. 2012) (holding that enjoining patent infringement under 35 U.S.C. § 283 involves substantive patent law and is thus governed by Federal Circuit case law). Thus, the Seventh Circuit cases cited throughout Moving Defendant's motion are, at best, persuasive authority. Where those cases apply a different standard than the standard employed by the Federal Circuit, they offer no authority at all.

All injunctions are governed by the same four factors set forth by the Supreme Court in *Winter*: which holds that a plaintiff must establish that 1) they are likely to succeed on the merits; 2) the plaintiff will suffer irreparable harm in the absence of preliminary relief; 3) the balance of

equities tips in their favor; and 4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Contrary to Moving Defendant's assertion, Federal Circuit caselaw holds that "no one factor, taken individually, is necessarily dispositive, because the weakness of the showing regarding one factor may be overborne by the strength of the others." *Belgium v. U.S.*, 452 F.3d 1289, 1292-93 (Fed. Cir. 2006) (internal quotation marks and citations omitted). Instead, the Federal Circuit recognizes that the factors are weighed as a whole such that, for example, a greater showing of potential irreparable harm results in a lesser burden on plaintiffs to show a likelihood of success on the merits, or vice versa. *Id.* (citing support). At a minimum, however, a plaintiff must demonstrate that "it has at least a fair chance of success on the merits for a preliminary injunction to be appropriate." *Wind Tower Coal. v. U.S.*, 741 F.3d 89, 96 (Fed. Cir. 2014) (citing *Qingdao Taifa Group Co. v. U.S.*, 581 F.3d 1375, 1381 (Fed. Cir. 2009) (internal quotation marks and citation omitted)).

### III. Scope of the Motion to Dissolve the Temporary Restraining Order

Moving Defendant's Motion is more properly considered a request to modify the TRO because Moving Defendant seeks only to lift the asset restraint included in the TRO. *See* Motion [31] at p. 1-2 ("Specifically, Moving Defendant seeks to unfreeze their assets as Plaintiff has failed to meet the heavy burden to show why the TRO is appropriate."). Moving Defendant also confirms that it alternatively proposes modifying the injunctive relief to:

1. Limit any freeze to only those directly traceable to the sale of the accused products;
2. Allow Defendants to access frozen funds for reasonable business operating expenses; [and]
3. Require Plaintiff to post a substantial bond to compensate ALL Defendants for damages and potential damages cause by wrongful restraint.

[31], p. 15 (emphasis in original).

In other words, Moving Defendant does not ask that the Court lift the injunction against continued sales of the Infringing Products. Addressing first the proposed alternative modification[2], the proposal is not significantly inconsistent with the current TRO at least not as presently enforced. Regarding modification number 1, Moving Defendant proposed limiting the TRO (and any subsequently issued preliminary injunction) to "only those [assets] directly traceable to the sale of the accused products." However, Financial assets, such as the disputed balance in Moving Defendant's online accounts, are entirely fungible. That is, there is no way to differentiate funds in a financial account as being "directly traceable" to the sale of one item or another. What can be shown definitively, is that the frozen balance pales in comparison to the volume of infringing sales. The TRO has been served on the marketplaces identified in Schedule A and each has responded with certain document production as called for in the TRO. *See* [21] at ¶4. As relevant to Moving Defendant, Amazon.com has responded to state that Moving Defendant's account, at the time of enforcing the TRO, held $35,505.57 and that Moving Defendant had sold $1,692,764.41 under the Product IDs identified in the TRO. *See* Exhibit A (Amazon.com production, filtered to Moving Defendant's Seller ID and ASINs). Meanwhile, Temu.com reported that it froze just $15.79 in Moving Defendant's account against sales of 58 units[3]. *See* Exhibit B (Temu.com production, filtered to Moving Defendant's Store ID and Product IDs). Collectively then, Moving Defendant has sold nearly $1.7M in accused sales and its finances have only been restricted by a mere $35,521.36 (roughly 2%).

---

[2] Plaintiff would have been willing to discuss this proposed modification during the Parties' December 6, 2024 telephone conference, but Moving Defendant wished only to discuss either a full settlement or a briefing schedule on the Motion. It is also noted that the proposed modifications are somewhat consistent with the proposals outlined in Plaintiff's initial response [35] to the Court's December 2, 2024 Minute Entry [32], which suggested *inter alia* that Moving Defendant place a bond in lieu of an asset restraint.

[3] Temu.com does not report sales in financial terms.

Recognizing that the balance of the financial accounts may continue to grow during this case, Plaintiff would not oppose capping the amount withheld at 100% of the disputed sales. Notably, because this is a design patent case, Plaintiff can recover the greater of a reasonable royalty under 35 U.S.C. § 284 or Moving Defendants "total profit" from any infringing sales. *See* 35 U.S.C. § 289. In establishing those damages, Plaintiff bears only the burden of showing sales (a burden it has already met as shown in Exhibits A and B) and it was Moving Defendants burden to show any costs or deductions. *See e.g.*, *Nordock Inc. v. Systems, Inc.*, No. 11-cv-118, 2017 U.S. Dist. LEXIS 192413, at *7 (E.D. Wisc. Nov. 21, 2017). Absent such a showing, the appropriate measure of profits is gross sales. This is particularly true because Moving Defendant appears to be undercutting Plaintiff's sales price. *Compare* Exhibit A (showing average sales prices of $8.96 - $9.25 for Moving Defendant's products on Amazon) *with* 31-3 (Exhibit 3 to Moving Defendant's Motion, showing sales price of over $15 for Plaintiff's product).

Regarding the second proposed modification – allowing Moving Defendants to access funds for normal business operations – again, the scope of the TRO as currently enforced appears to address this concern. As shown above, Moving Defendant has made nearly $1.7M in accused sales and has lost access to a mere $35,521.36. Meanwhile, Moving Defendant asserts to have only a single shareholder (*see* Notification of Affiliates [30]) and asserts to sell approximately 27 other products that are not restricted by the current TRO (*see* [31-1] Declaration of Fangzhou Chai at ¶4). Finally, as noted above, Plaintiff would not oppose limiting the asset freeze to the total sales of the Infringing Products (roughly $1.7M) after which, assuming there were no further infringing sales, Moving Defendant would be free to use excess proceeds for any purpose.

Finally, Moving Defendant lacks standing to request a bond to compensate for perceived damages to other Defendants. Likewise, the Court has already required a substantial bond of

5

$10,000 which has been deemed "adequate for the payment of such damages as any person may be entitled to recover as a result of a wrongful restraint hereunder." [21] at p. 7. Moving Defendant provides no support for its assertion that it has incurred any damages as a result of the TRO and, as outlined below, has failed to demonstrate that it has been wrongfully enjoined or that the TRO should be vacated. Consequently, there is already an adequate bond.

To the extent the Court determines that the TRO (or a subsequently entered preliminary injunction) requires further restrictions as to Moving Defendant, Plaintiff proposes that the injunction be modified only to limit the scope of the asset restraint to the gross infringing sales, *i.e.* $1,692,764.41 plus the gross sales for Moving Defendant's 58 products sold on Temu.

## IV. There Has Been Nothing Nefarious About the Timing of the TRO

Contrary to Moving Defendant's assertions, Plaintiff did not delay requesting a hearing on its temporary restraining order until November 15, 2024 and the timing of the Court's Order had nothing to do with Thanksgiving holiday. To the contrary, the docket clearly indicates that Plaintiff promptly moved for a TRO just nine days after it filed the Complaint. *Compare* Complaint [1], filed on June 19, 2024 *with* Motion for Temporary Restraining Order [14] and Memorandum in Support [15] each filed on June 28, 2024. On July 3, 2024, the Court entered and continued Plaintiff's TRO Motion along with Plaintiff's Motion for Leave to File Under Seal [4] and its Motion for Electronic Service of Process [16]. *See* July 3, 2024 Minute Entry [17]. The Court continued those motions because the Court *sua sponte* Ordered that Plaintiff first address whether joinder was proper in this case. *Id.* As Ordered, Plaintiff filed a Memorandum [18] establishing that joinder was proper on July 22, 2024. In other words, Plaintiff promptly requested a temporary restraining order and promptly responded to the Court's question regarding joinder.

No plaintiff has direct control over how quickly a court will rule on a motion. Thus, Plaintiff could not control whether the Court addressed the question of joinder and the subsequent ruling on the temporary restraining order immediately after Plaintiff's supplemental filing in late July or at any time thereafter. Plaintiff certainly did not request that the Court withhold its ruling until closer to the Thanksgiving holiday. Rather, Plaintiff requested a status hearing when it discovered that a prominent website catering to foreign intellectual property infringers has published a webpage dedicated to this case and that the webpage had received over 1,700 visits. *See* Motion for Status Hearing [19] and screenshot of [www.sellerdefense.cn](www.sellerdefense.cn) webpage [19-1]. If the TRO had been entered in June/July, Moving Defendant would complain that it was strategically timed for the July 4 shopping weekend; if it had been entered in August/September, Moving Defendant would complain that it was strategically timed for back to school and end of summer sales; and if it had been entered in October, Moving Defendant would that it was strategically timed for Amazon's Prime Day sales. In the end, plaintiffs have no direct control and, at best, limited influence over when temporary restraining orders are entered in cases and this case is no different.

## V.    Plaintiff Has Adequately Shown Irreparable Harm

Ironically, Moving Defendant's own purported evidence demonstrates the threat of irreparable harm if Defendants, including Moving Defendants, are not enjoined from continuing to infringe Plaintiff's patent rights. Specifically, Moving Defendant asserts to provide "publicly available" sales and ranking data of Plaintiff's product through a paid subscription to "Keepa." *See* Motion [31] at p. 6 and Exhibit 3 thereto [31-3] (asserting that Plaintiff's sales peaked near the time it filed its Complaint in June 2024). Setting aside the validity and authenticity of this information, Moving Defendant's own evidence shows a steady decline in sales rank before the

TRO was entered. *See* [31-3] at p. 3 (graph at top of page showing steady increase in sales rank before July – demonstrated by the green line approaching the horizontal access – and a substantial decrease thereafter – demonstrated by the green line proceeding away from the axis). The recent data shown in Moving Defendants exhibit shows the effect the TRO has had in reverting this trend and returning the *status quo* in that the green line appears to be reverting back toward the horizontal access, though still significantly lagging behind the pre-suit numbers. In other words, Moving Defendant's Exhibit 3 demonstrates that absent injunctive relief, Plaintiff's sales ranking (which is indicative of the unquantifiable success of its market share) was declining and that the entrance of the injunctive relief began to correct the market to the pre-suit condition.

The second chart on page 3 of Moving Defendant's Exhibit 3 [31-3] tells a similar story. This chart appears to contrast the monthly number of sales (indicated by the yellow line) on top of sales ranking data across different related genres (the various shades of green). As shown, sales were increasing before suit, plateaued around the time of suit, had one brief blip in August before returning to the plateau, and then decreased until the TRO was entered. *Id.* After the TRO was entered, the sales appear to be moving upward, though still lag behind even the post-suit plateau numbers. In other words, Moving Defendant's own evidence again demonstrates the lost sales and lost market share Plaintiff was experiencing absent injunctive relief and the start of a return to the *status quo ante* after the injunction was entered.

As noted in Plaintiff's Memorandum in Support of its Motion for Temporary Restraining Order, loss of market share is difficult or impossible to quantify and thus constitutes irreparable harm. *See* [15], p. 8-9 (citing *Black & Decker v. Robert Bosch Tool Corp.*, No. 04-C-7955, 2006 U.S. Dist. LEXIS 86990 (N.D. Ill. Nov. 29, 2006) ("Loss of market share is a key consideration in determining whether a plaintiff has suffered irreparable harm")). Likewise, even after the Supreme

Court rejected a presumption of irreparable harm in *eBay v. MercExchange, LLC*, 547 U.S. 388, 394 (2006), courts have continued to look to the loss of the right to exclude as a relevant factor to consider when weighing irreparable harm. *Id.* at p. 10 (citing *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 659 F.3d 1147, 1149 (Fed. Cir. 2011). This is particularly true in the present case because Plaintiff has valued its right to exclude as an asset from which it derives market share. Moving Defendant's own evidence demonstrates this point and demonstrates that even injunctive relief cannot immediately restore Plaintiff to its pre-suit condition. Thus, even a permanent injunction would not remedy the harm Plaintiff will suffer in the interim absent preliminary relief.

It should be appreciated that a reduction in *sales ranking*, as evidenced by Moving Defendant's charts, goes beyond mere lost sales. In the modern world of e-commerce, sales rankings are essentially feedback loops in that an increase in sales, resulting in improved sales ranking, further improves sales, which further improves sales ranking, etc. Conversely, decreased sales and decreased sales ranking have a similar negative feedback loop. This is because online marketplaces are designed to promote successful products under the belief that those will be the products that consumers want. Thus, Plaintiff's loss of market share and sales ranking has an unquantifiable impact on its sales. That is, its not merely that a possible sale went to Moving Defendant instead of Plaintiff, but that if Plaintiff would have rightfully obtained that sale (or more accurately a number of sales) it would have improved Plaintiff's sales ranking and led to an unknown number of additional sales. That loss of sales ranking and loss of unknown future sales is thus unquantifiable and irreparable by mere money damages or a later permanent injunction.

### VI. Moving Defendant's Purported Invalidity Defense Lacks Substantial Merit

Moving Defendant identifies three purported pieces of prior art in its Motion [31] and attempts to raise an additional purported reference in its uninvited Reply [36]. The references do

not invalidate Plaintiff's Asserted Patent (U.S. Patent No. D964,544, the '544 Patent).

The first purported reference identified by Moving Defendant is Chinese Design No. CN305809740S (the '740 Design), purportedly issued on May 26, 2020. Moving Defendant readily admits, however, that the '740 Design does not anticipate the design of the '544 Patent and instead asserts that any difference is a "conventional ornamental feature in fan products as disclosed for example in CN306581614S . . . and KR3009971280000S." [31] at p. 9. Against these references, Moving Defendant provides only a single comparative image of two figures from the '740 Design next to the cover image of the '544 Patent. Moving Defendant thus fails to address the design of the '544 Patent from all views claimed in the '544 Patent.

Design patents are presumed to be valid. 35 U.S.C. § 282(a). Thus, a party seeking to invalidate a patent on obviousness grounds must do so by clear and convincing evidence. *See Catalina Lighting v. Lamps Plus*, 295 F.3d 1277, 1288 (Fed. Cir. 2002). The Federal Circuit has recently restated the test for obviousness (disposing of the prior *Rosen/Durling* test) and held that "[i]nvalidity based on obviousness of a patented design is determined [based] on factual criteria similar to those that have been developed as analytical tools for reviewing the validity of a utility patent under § 103, that is, on application of the *Graham* factors." *LKQ Corp. v. GM Glob. Tech. Operations LLC*, 102 F.4th 1280, 1295 (Fed. Cir. 2024) (quoting, with alteration, *Hupp v. Siroflex of Am. Inc.*, 122 F.3d 1456, 1462 (Fed. Cir. 1997)). In *Graham*, the Supreme Court explained that obviousness is ultimately a question of law but based on several factual inquiries including 1) the scope and content of the prior art; 2) the differences between the prior art and the claimed invention; 3) the level of ordinary skill in the art at the time of the invention and 4) certain "secondary considerations" of non-obviousness such as commercial, success, long felt need, failure of others, etc. *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

Moving Defendant largely leaves this inquiry to the Court's imagination. Again, Moving Defendant provides only one comparative image and fails to show or allege how teachings of one reference would be combined into the teachings of other references. Moving Defendant readily admits that the '740 Design lacks at least one design element present in the '544 Patent – a circular ring near the back cover. [31], p. 9. Additionally, the '544 Patent includes parting lines that are not shown in the '740 Design, additional internal components, and a protruding bump on its front surface:



'544 Patent Figure 6

In contrast, the '740 Design has a smooth front surface, no parting lines, and fan elements that appear more rearwardly located with an otherwise open interior:



While Moving Defendant need not prove invalidity by clear and convincing evidence at this stage, they must still demonstrate that the asserted patent is vulnerable to invalidity. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1359 (Fed. Cir. 2001) (distinguishing the standard at summary judgment or trial from the lesser burden at the preliminary injunction state). Here, the threadbare assertion of obviousness in Moving Defendant's Motion [31] falls well short of showing that it is likely to succeed in proving invalidity and thus Moving Defendant's purported invalidity defense lacks substantial merit and does not prohibit the entrance of injunctive relief. The shortcomings of Moving Defendant's argument is readily apparent from its assertion of motivation. Specifically, Moving Defendant asserts that "an ordinary designer in the field would have been motivated to modify the '740 design to include the circular ring disclosed in the '614 Patent or the '000 Patent to create the same visual appearance as the claimed handheld

fan design." [31] at p. 10. This is a clear recitation of hindsight construction. The only reason Moving Defendant asserts for combining the references is to recreate the claimed design taught by the '544 Patent. In other words, the asserted patent itself is the only motivation to combine.

Moving Defendant's Uninvited Reply [36] names an additional piece of purported prior art simply as ASIN B0919T22LT, which Moving Defendant asserts has been available for sale since March 29, 2021. Again, Moving Defendant little actual analysis. Instead, Moving Defendant provides a single image which has several notable differences including a different base shape, different fan shroud, and a pedestal that tapers near its top. Moreover, Moving Defendant fails to authenticate the product or present competent evidence regarding its purported sales date. Moving Defendant provides no information about what or who "Keepa" or why the information they purportedly provide about ASIN B0919T22LT is accurate or reliable. For at least these reasons Moving Defendant has failed to support its assertion of invalidity.

## VII. Moving Defendant's Products Infringe the '544 Patent

Turning back to the substance of the Temporary Restraining Order, the Order prevents Defendants, including Moving Defendant from *inter alia* "making, using, importing, offering for sale, or selling products that infringe upon [U.S. Patent No. D964,544], including the products described in the Verified Complaint and its accompanying exhibits and those available at or under the accused product URLs, ASINs, and/or Product IDs listed in Schedule A to the Verified Complaint and attached hereto . . ." [21] at p. 2-3. For the Moving Defendant, identified as Defendant Stores #13 and 65, those products are as follows:

| Def. # | Merchant Alias | Merchant ID | Product ID | Platform |
|---|---|---|---|---|
| 13 | SWEETFULL® | A4BBO00J6TH94 | B0BR3HFJZB<br>B0BR3JG3C8<br>B0CC1LVWHB | Amazon |
| 65 | SWEETFULL | 634418210084037 | 601099554610553<br>601099556211440 | Temu |

*See* TRO [21] at pp. 9, 14 (identifying infringing products by Product Links, which include ID numbers as part of the link), *see also* Schedule A to Complaint [5-1] at pp. 3, 9 (providing both Product IDs and links).

Plaintiff also included images of each Infringing Product with its Verified Complaint to support its request for a temporary restraining order. *See* Exhibit 2 to the Complaint [6]-[9] (Moving Defendant's products under its Amazon store, Defendant Store No. 13, are included in Exhibit 2A [6] and Moving Defendant's products under its Temu store, Defendant Store No. 65, are included in Exhibit 2C [8]).

Moving Defendant attempts to differentiate its product by asserting purportedly substantial difference between its products and the '544 Patent (while falsely asserting that the '740 Design is identical, despite previous acknowledging differences). It should be noted that a "patented and allegedly infringing designs need not be identical for infringement of a design patent to be found." *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1011 (N.D. Ill. 2010) (citing *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997)). Indeed, the Patent Act incorporates "colorable imitation" within the definition of infringement for a design patent. *See* 35 U.S.C. § 289. Thus, the inquiry is whether an ordinary observer, familiar with the prior art, would be deceived into thinking that the accused design was the same as the patented design." *Egyptian Goddess, Inc., v. Swisa, Inc.*, 543 F.3d 665, 672 (Fed. Cir. 2008). While there are minor differences between the '544 Patent and the Infringing Products sold by Moving Defendant, they are insubstantial and do no more than render Moving Defendant's design a "colorable imitation" of Plaintiff's patented design. In fact, Plaintiff believes that discovery will demonstrate that Moving Defendants directly lifted the design of their product from Plaintiff. In view of the substantial showing of irreparable harm discussed above and the Federal Circuit's application of a "sliding

scale" analysis, Plaintiff has shown at least a fair chance of success on the merits that in view of the other factors weighs in favor of a preliminary injunction. *See Wind Tower Coal* 741 F.3d at 96.

**VIII. Balance of Hardships and the Public Interest**

Moving Defendant's assertions regarding hardship conflict with the undisputed facts and its own statements. For example, Moving Defendant cannot reasonably be harmed by the freezing of its Temu account (and the $15.79 held therein) where it acknowledges that the account is "not as actively managed" and thus Moving Defendant was not even aware that it was restricted. *See* [36] at p. 5. Likewise, the discovery from Amazon shows that Moving Defendant has made nearly $1.7M selling just one of its 28 products over the last two years. *Compare* Exhibit A (showing sales of the Infringing Product) *with* [31-1] ¶4 (asserting Moving Defendant sells 27 other products) and ¶6 (asserting that the Infringing Product has been sold since December 2022).

Moving Defendant provides only attorney argument regarding harm stating, without support, that the TRO (which is holding $35,521.36) is preventing basic business operations but fails to identify what those operations are or how Moving Defendant is prevented from meeting them. The unsupported argument does not outweigh the loss of market share discussed *supra*.

Similarly, Moving Defendant asserts that the public interest is served by "fostering competition and ensuring availability of innovative products to consumers." [31], p. 13 (citing *Apple, Inc. v. Samsung, Elecs., Co*, 695 F.3d 1370, 1375 (Fed. Cir. 2012). If the desire for alternative products were enough to defeat a preliminary injunction, no injunction would ever issue against ongoing infringement. The harm to the public interest at issue in this factor is more akin to a pressing public need for medical devices, drugs, or other products that would damage the public good if access were restricted unnecessarily. *See e.g.*, *Hybritech, v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1998). This is not such a case.

Date: December 9, 2024

Respectfully submitted,

/s/ Benjamin A. Campbell
Edward L. Bishop
ebishop@bdl-iplaw.com
Nicholas S. Lee
nlee@bdl-iplaw.com
Benjamin A. Campbell
bcampbell@bdl-iplaw.com
Sameeul Haque
shaque@bdl-iplaw.com
BISHOP DIEHL & LEE, LTD.
1475 E. Woodfield Road, Suite 800
Schaumburg, IL 60173
Tel.: (847) 969-9123
Fax: (847) 969-9124

*Counsel for Plaintiff, Shenzhen Gaiyatuopu Network Technology Co., Ltd.*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system this December 9, 2024. Any other counsel of record will be served by electronic mail and/or first-class mail.

/s/ Benjamin A. Campbell
Benjamin A. Campbell